UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| SYNDICATE 1245 AT LLOYD'S, | : | **Civil No. 09-1697 (FLW)** |
| Plaintiff, | : | |
| v. | : | **OPINION** |
| WALNUT ADVISORY CORPORATION, et al., | : | |
| Defendants. | : | |

Plaintiff Syndicate 1245 at Lloyd's ("Lloyd's") filed the instant action against Defendant Walnut Advisory Corporation ("Walnut"), and John Does 1-5, alleging primarily that Walnut breached the parties' agreement by writing insurance for bars and nightclubs. Lloyd's claims sound in breach of contract, breach of fiduciary duty, and negligence. Walnut filed the instant motion to dismiss based on Lloyd's failure to file an affidavit of merit ("AOM") pursuant to N.J.S.A. 2A:53A-26, et seq. ("Affidavit of Merit Statute" or "AOM Statute"). Lloyd's subsequently served Walnut with an AOM and cross-moved for *nunc pro tunc* compliance with the statute. This Court held oral argument on April 27, 2010, and denied Walnut's motion to dismiss for failure to timely submit an AOM with respect to the breach of contract and breach of fiduciary duty claims. The Court now denies Walnut's motion to dismiss with respect to the negligence claim, and grants Lloyd's cross-motion for *nunc pro tunc* compliance.

I.     **BACKGROUND**

Lloyd's alleges that it entered into a "2004 Binding Authority Agreement" ("the Agreement") with Walnut, whereby Walnut served as its Coverholder, *i.e.*, insurance agent. Compl. at ¶ 1. Under the Agreement, Walnut was to "bind insurances and amendments thereto ...." Id. at ¶ 6. While granting Walnut general authority to bind policies, the Agreement included underwriting guidelines that limited

Walnut's authority to write policies for certain businesses.  See id. at ¶¶ 8-9.  Specifically, the Agreement

provided the following limitations:

> No bar, tavern, or nightclub business to be written.
>
> No hospitality business to be written without an Assault and Battery
> exclusion unless Liquor receipts are below 33.3% of total receipts,
> which inclusion of the Assault and Battery exclusion is at the
> Coverholder's discretion.

Id. at ¶ 10.  The underwriting process, further, required Walnut to inspect an insured's business premises

and operations after coverage was bound and to create an inspection report detailing the results of that

inspection.  Id. at ¶ 19.

In binding policies under the 2004 Binding Authority Agreement, the Complaint alleges, Walnut

utilized the services of producing agents.  Id. at ¶ 11.  One of these agents was The Carman Agency

("Carman").  Id.  According to the Complaint, Carman repeatedly submitted applications to Walnut for

full Assault and Battery coverage.  See id. at ¶¶ 12-13.  "Notwithstanding the aforementioned

underwriting guidelines and restrictions imposed by the [Agreement] and the knowledge which Walnut

possessed regarding Carman's insistence on [Assault and Battery] Coverage, Walnut continuously

accepted applications from Carman and bound insurance without A&B exclusions in contravention of

[the A]greement," the Complaint alleges.  Id. at ¶ 13.  In addition, the Complaint continues, Walnut

issued policies to bar, tavern, and nightclub businesses after receiving such applications from Carman,

also in contravention of the Agreement.  Id.

The Complaint, further, characterizes Walnut as having "held itself out . . . as a competent

Coverholder who adhered to accepted professional standards in the practice of writing and placing

insurance, and that it was skilled and capable in matter [sic] involving the issuance of insurance for the

Lloyd's of London insurance market."  Id. at ¶ 22.  Also, in paragraph 23 of the Complaint, Lloyd's

alleges that "Walnut owed a duty to exercise the skill, prudence, and diligence ordinarily possessed by

a Coverholder in the rendering of their services."  Id. at ¶ 23.  Lloyd's alleges that it incurred over

$7,876,932 in damages as a result of Walnut's breaches and derelictions.  Id. at ¶ 26.

In late 2007, Lloyd's engaged the services of Paul Frank & Collins Insurance Services ("PFC") to review Walnut's underwriting for the 2004 contract year.  Id. at 16.  Walnut cooperated with PFC and, after reviewing Walnut's documents, PFC produced a written audit ("PFC Audit") containing its findings.  In the PFC Audit, the Complaint alleges, PFC focused on two Walnut practices: (1) writing policies to bars, taverns, and nightclubs; and (2) writing policies to hospitality businesses, that had over 50% liquor receipts, without obtaining an Assault and Battery exclusion.  Id. at ¶ 17.  In terms of writing policies to bars, taverns, and nightclubs, the audit states that Walnut "routinely ignored information within . . . inspection reports that the insureds being provided coverage . . . were in many cases bars and taverns with only incidental food service, or were nightclubs, rather than quality restaurants that served alcohol."  Id. at ¶ 21.  In terms of writing policies to hospitality businesses, the audit states that Walnut received applications that expressly indicated greater than 33.33% liquor receipts.  When Walnut subsequently inspected these businesses, "[i]n most instances the inspection report which was generated either confirmed the percentage of liquor sales stated in the application, or indicated a higher percentage of liquor sales than was stated on the application ...."  Id. at ¶ 20.  "[H]owever," the audit continues, "Walnut failed to react to the inspection report as it relates to the 2004 Binding Authority Agreement permitted class of businesses."  Id.

In September 2008, and prior to bringing the instant suit, Lloyd's sent a letter to Walnut highlighting salient portions of the PFC Audit.  See Manganiello Letter dated September 8, 2008 at 2-3, Jabbour Cert., Exh. 13.  In that correspondence, Lloyd's stated that the PFC Audit "provides compelling grounds for a breach of contract claim against Walnut due to Walnut's issuing policies . . . that should have never been issued or should have included an [Assault and Battery] exclusion."  Id. at 1.  The correspondence cites one example from the PFC Audit as follows:

> The underwriting file for *Twelfth Air Command* provides an example of
> an insured that is clearly a nightclub, yet the policy application described

> it as a restaurant and tavern with 44% liquor sales.  Notwithstanding the application, the inspection report unequivocally states 'this establishment is a nightclub.' . . . Walnut did not react to this inspection report and the policy was issued.

Id. at 3.  After providing several of these examples, the correspondence stated that "[w]hile the Carman Agency may have misled Walnut concerning the nature and quality of risks presented, it appears that Walnut had enough independent information to discover the true nature of these business operations."

Id.  Thus, the correspondence continues, "Walnut failed to appropriately react to the information contained in the inspection reports" and this "apparent failure to effectively use the inspection process was a significant factor resulting in the binding authority violations."  Id.  Lastly, the correspondence clarified that Lloyd's damages claim against Walnut was based on "PFC's audit finding on losses from [Assault and Battery] claims that should have fallen under an [Assault and Battery] exclusion and all claims against bars, taverns, or nightclubs."  Id. at 4.

Several months later, in December 2008, Lloyd's sent another letter to Walnut.  Manganiello Letter dated December 3, 2008, Jabbour Cert., Exh. 14.  In that letter, Lloyd's responded to a request from Walnut for a complete copy of the PFC Audit.  Id. at 1.  Lloyd's expressed its willingness to forward a complete copy, provided that Walnut agreed to disclose to Lloyd's certain emails, notes, and other communications relating to the parties' agreement.  Id.  By January 8, 2009, Walnut had not agreed to disclose the information Lloyd's sought.  See Manganiello Letter dated January 8, 2009, Jabbour Cert., Exh. 19.

Meanwhile, Liberty Syndicates, another syndicate of Lloyd's, was also encountering difficulties with Walnut regarding the latter's writing and binding of policies for nightclubs and similar establishments.  On March 23, 2009, Liberty Syndicates brought an action against Walnut in this Court, alleging that it "suffered . . . damages in the form of claims that Liberty [Syndicates] has paid . . . on policies wrongfully issued by Walnut in violation of its binding authority ....," Am. Compl. at ¶ 27, Liberty Syndicates at Lloyd's v. Walnut, Civil Action No. 09-1343.  Liberty Syndicates also alleges that

Walnut was a Coverholder for Liberty Syndicates, id. at ¶ 8, and that Walnut bound insurance for nightclubs in contravention of the parties' agreement, id. at ¶ 16.  That complaint, further, alleges that Walnut "issue[d] policies to insureds who derive more than 50% of their receipts from liquor sales without [the syndicate] having been consulted and having approved the risk or binding" and such policies "failed to include assault and battery exclusions" where the parties' agreement "required such an exclusion be included ...."  Id.  The Liberty Syndicates Complaint asserts claims for "Negligent Errors and Omissions/Professional Malpractice," breach of contract, and breach of fiduciary duty, against Walnut.

It is important to summarize here the similarities between the Liberty Syndicates action and the instant action.  The plaintiffs in each action are different Lloyd's Syndicates.  The agreements in both suits are substantially the same, though they govern different time periods.  Walnut is the defendant in both suits, and is represented by the same counsel.  The alleged breaches by Walnut are mirrored in the complaints.  Lastly, both complaints assert negligence-based claims, although the Liberty Syndicates action utilizes the "Professional Malpractice"caption while the Lloyd's complaint here utilizes a generic "Negligence" caption.

Little over a week after the Liberty Syndicate's Complaint was filed, on April 2, 2009, Lloyd's instituted the instant action in this Court.  Lloyd's complaint here asserts negligence, breach of contract, and breach of fiduciary duty claims based on Walnut's binding and writing of policies to bars, taverns, and nightclubs along with Walnut's binding and writing of policies to hospitality establishments without the appropriate Assault and Battery exclusions.  Walnut answered the complaint on June 3, 2009.

A Rule 26 conference was held, on July 20, 2009, before the Magistrate Judge.  At this conference, Lloyd's counsel asserts, Walnut advised the judge that "the only anticipated motion practice relating [sic] to the addition of third parties."  Pl. Supp. Br. at 1.  Shortly thereafter, on July 30, 2009, the Magistrate Judge issued a pretrial scheduling order, which order generally directed that any

dispositive motions be filed by June 25, 2010.  Pretrial Scheduling Order dated July 30, 2009, Syndicate 1245 at Lloyd's v. Walnut, et al., Civil Action No. 09-1697, Docket Entry No. 13 ¶¶ 9, 14.  The only other specific motions mentioned in the Order are a motion to join new parties and a motion to amend the complaint.

In addition, as part of its Rule 26 disclosure obligations, Plaintiff made the PFC Audit available for Walnut's inspection.  Walnut, however, chose not to inspect the audit at that time.  See Jabbour Letter dated Nov. 6, 2009, Jabbour Cert., Ex. 16.

On August 10, 2009, an AOM was filed in the Liberty Syndicates action.  That AOM was authored by Samuel Bergerman, who stated that he is president of a licensed independent surplus lines insurance brokerage with over "30 years experience acting as a Lloyd's Coverholder."  Affidavit of Merit of Samuel Bergerman dated July 2, 2009, Liberty Syndicates at Lloyd's v. Walnut, Civil Action No. 09-1343.  The sworn affidavit states that "there is a reasonable probability that the care, skill or knowledge exercised by defendant, Walnut Advisory Corporation, fell outside the acceptable professional standards."  Id.

The next month, on September 28, 2009, the parties in the instant action participated in a telephone conference with the Magistrate Judge.  While the details of that conference are not part of the record before this Court, the parties agree that, at that conference, Walnut did not advise the Court or Lloyd's of any intention to file a motion to dismiss based on Lloyd's failure to serve an AOM. Walnut acknowledges that the parties also agreed, at that conference, that the instant action "should be consolidated with [the] similarly situated action[—Liberty Syndicates—] for purposes of discovery." Def. Supp. Br. at 2.  Importantly, Defendant agreed to this consolidation prior to the expiration of the 120-day period for filing the AOM, which the parties agree was October 1, 2009.

Walnut filed the instant motion to dismiss for failure to file an affidavit of merit on October 12, 2009—eleven days after the AOM was due.  On October 19, 2009, Lloyds served Walnut with an AOM.

<u>See</u> Affidavit of Merit of Samuel Bergerman dated October 16, 2009, Jabbour Cert., Exh. 9.  That AOM, like the one in the Liberty Syndicates action, was authored by Samuel Bergerman and mirrors the language of the Liberty Syndicates' AOM.  <u>Id.</u>  The AOM was eighteen days late.[1]  A few days after the AOM was filed, on October 21, 2009, the suit was consolidated with the Liberty Syndicates action for discovery purposes.  Lloyd's then filed its opposition on November 23, 2009 to the motion to dismiss, and cross-moved for a finding of *nunc pro tunc* compliance with the AOM statute.

Once all briefing was filed, the Court held oral argument on the motion to dismiss on April 27, 2010.  The Court denied Walnut's motion to dismiss for failure to submit an AOM with respect to the breach of contract and breach of fiduciary duty claims on the record.  The Court found that the allegations related to those claims referenced only, and were rooted in, the parties' 2004 Binding Authority Agreement, and that expert testimony was not required to establish those claims.  Lloyd's cross-motion for *nunc pro tunc* compliance, as to those counts, was rendered moot by the Court's finding and denial of Walnut's motion and, therefore, also denied.  The Court reserved decision on the negligence count, and granted the parties leave to file supplemental briefing with respect to that claim.  For the following reasons, the Court denies Walnut's motion to dismiss and grants Lloyd's cross-motion for *nunc pro tunc* compliance with the statute in regards to the negligence claim.

## II.   <u>STANDARD OF REVIEW</u>

As the Court noted at oral argument, Defendant's motion to dismiss was improperly brought under Federal Rule of Civil Procedure 12(b)(6) because it was filed after Defendant's answer.  For this reason, the Court construed Defendant's motion as if brought under Rule 12(c), which rule permits parties to challenge the sufficiency of the pleadings "after the pleadings are closed—but early enough not to delay trial."  Fed. R. Civ. P. 12(c).

---

[1]    Shortly thereafter, on November 16, 2009, Lloyd's mailed a copy of the entire PFC Audit to Walnut in the course of discovery.  Jabbour Letter dated Nov. 16, 2009, Jabbour Cert., Exh. 16.

Adjudication of this motion necessitates that the Court consider documents outside the pleadings. These documents include the PFC Audit, correspondence between the parties regarding provision of the audit to Walnut, the 2004 Binding Authority Agreement, and the court records and proceedings of the Liberty Syndicates action. This raises an issue regarding the propriety of considering these documents because Rule 12(c) provides that

> on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

Fed R. Civ. Proc. R. 12(c).

The Third Circuit has held, however, that the Rule's language does not prohibit a district court from considering exhibits attached to the complaint, matters of public record, and undisputedly authentic documents if the plaintiff's claims are based upon those documents. See Pension Benefit Guar. Corp. v. White Consol. Indus., 998 F.2d 1192, 1196 (3d Cir. 1993); see also Charles Alan Wright & Arthur R. Miller, 5C FEDERAL PRACTICE AND PROCEDURE: 3d § 1371 ("Because Rule 10(c) incorporates into the pleadings all exhibits attached thereto and materials referred to, the district court can consider those documents in deciding a Rule 12(c) motion"). The "critical [issue] is whether the claims in the complaint are 'based' on an extrinsic document and not merely whether the extrinsic document was explicitly cited." In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997) (emphasis in original) (citations omitted). This is so whether the extrinsic document is attached to defendant's or the plaintiff's moving papers. See Pension Ben. Guar. Corp. v. White Consol. Industr., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993). As long as the document is authenticated, and the parties do not dispute the document's authenticity, the court need not convert the motion into one for summary judgment in order to consider the document. See id.; In re Burlington Coat Factory Sec. Litig., 114 F.3d at 1426.

Each of the extra-complaint documents I rely upon in reaching my decision on the negligence count is appropriately considered under Rule 12(c). The PFC Audit was referenced in the complaint and forms part of the basis for the negligence claim. The correspondence between the parties regarding providing the audit to Walnut may also be considered to the extent it establishes pre-suit delivery of salient portions of the audit—a fact that Walnut does not dispute. Accord Citisteel USA, Inc. v. General Elec. Co., 78 Fed.Appx. 832, *2 (3d Cir. Oct. 28, 2003) (affirming district court's consideration, under Rule 12(c), of correspondence indicating delivery of purchase order). The 2004 Binding Authority Agreement is specifically referenced in the complaint, with the complaint quoting applicable portions thereof. Finally, the court records and proceedings of the Liberty Syndicates action are matters of public record. Accordingly, I need not convert the parties' motions to ones for summary judgment and may apply the motion to dismiss standard.

On a motion to dismiss under Rule 12(c), courts must "accept all factual allegations in the complaint as true and view them in the light most favorable to the plaintiff." Buck v. Hampton Tp. School Dist., 452 F.3d 256, 258 n.3 (3d Cir. 2006). The court, however, "will not accept unsupported conclusory statements." DiCarlo v. St. Mary Hosp., 530 F.3d 255, 263 (3d Cir. 2008). "Under Rule 12(c), judgment will not be granted unless the movant clearly establishes that no material issue of fact remains to be resolved and that he is entitled to judgment as a matter of law." Rosenau v. Unifund Corp., 539 F.3d 218, 221 (3d Cir. 2008) (quoting Jablonski v. Pan Am. World Airways, Inc., 863 F.2d 289, 290 (3d Cir. 1988)).

In addition, this Court may consider the extra-complaint documents in ruling on Plaintiff's cross-motion for substantial compliance under the AOM statute. New Jersey state and federal decisions routinely consider documents outside of the complaint in connection with substantial compliance rulings. See e.g., Galik v. Clara Maass Med. Ctr., 167 N.J. 341 (2001) (considering pre-suit correspondence between the parties and unsworn expert reports); Paragon Contractors, Inc. v.

<u>Peachtree Condo. Assn.</u>, 406 N.J. Super. 568, 579 (App. Div. 2009) (considering affidavit of plaintiff's legal assistant).  <u>See also</u> <u>Vitale v. Carrier Clinic, Inc.</u>, 2009 WL 2390602, * 9 (D.N.J. Jul. 31, 2009) (considering expert affidavit).

## III.  <u>DISCUSSION</u>

The AOM statute was enacted by the New Jersey legislature in 1995 to "require plaintiffs in malpractice cases to make a threshold showing that their claim is meritorious, in order that meritless lawsuits readily could be identified at an early stage of litigation." <u>In re Petition of Hall</u>, 147 N.J. 379, 391 (1997).  One goal of the statute is that "the resources and time of the parties will not be wasted by the continuation of unnecessary litigation." <u>Knorr v. Smeal</u>, 178 N.J. 169, 176 (2003).  In pertinent part, the statute provides that

> [i]n an action for damages for . . . property damage *resulting from an alleged act of malpractice or negligence by a licensed person in his profession or occupation*, the plaintiff shall, within 60 days following the date of filing of the answer to the complaint by the defendant, provide each defendant with an affidavit of an appropriate licensed person that there exists a reasonable probability that the care, skill or knowledge exercised . . . fell outside acceptable professional . . . standards.

N.J.S.A. 2A:53A-27 (emphasis added).  The statute, further, provides for a 60-day extension "upon finding of good cause." <u>Id.</u>

New Jersey courts have interpreted the AOM statute to apply to those claims that "require proof of a deviation from the professional standard of care for that specific profession." <u>Couri v. Gardner</u>, 173 N.J. 328, 341 (2002).  In ascertaining whether the claims require such proof, courts must look to the underlying factual allegations, and not how the claim is captioned in the complaint. <u>Id.</u> at 339.  So, that a claim is labeled "negligence" or "breach of contract" is not dispositive; it is the nature of proof required that controls. <u>Id.</u> at 341.  Where the allegations do not require proof of a deviation from a professional standard of care, no affidavit is required.  Cases fitting this categorization are referred to as "common knowledge" cases. <u>See</u> <u>Hubbard v. Reed</u>, 168 N.J. 387, 394-95 (2001) ("[A] plaintiff in a

common knowledge malpractice case will not need expert testimony at trial to establish the standard of care or a deviation therefrom.").

Lloyd's acknowledges that it did not timely file an AOM in the instant suit, but argues, in the first instance, that no AOM is necessary as a matter of law.  Alternatively, Lloyd's cross-moves to have the October 19, 2009 AOM served *nunc pro tunc* under the doctrine of substantial compliance.  Walnut does not substantively challenge the contents of the late-served AOM.  Rather, it argues that an AOM was required and that Lloyd's failure to timely serve its AOM should not be excused under the substantial compliance doctrine or any other equitable basis.  For the following reasons, I conclude that Lloyd's late filing should be accepted *nunc pro tunc* based on both the doctrine of substantial compliance and other equitable considerations set forth herein.

A.     Necessity of the Affidavit of Merit

It is clear, and Lloyd's does not dispute, that the AOM statute generally applies to insurance producers such as Walnut.  The statute specifically indicates that it applies to insurance producers, defining such producers as those "required to be licensed under the laws of [New Jersey] to sell, solicit or negotiate insurance." Boerger v. Commerce Ins. Svcs., 2005 WL 2901903, *2 (D.N.J. Nov. 1, 2005) (Rodriquez, J.) (quoting N.J.S.A. 17:22A-26 (2005)).  This means that malpractice or negligence allegations made against insurance producers fall within the ambit of the statute. What is less clear is whether the specific allegations made here bring the claims within the proscription of the statute.

In the allegations of the negligence count, Lloyd's uses terminology typically reserved for professional negligence actions.  It alleges that "Walnut owed a duty to exercise the skill, prudence and diligence ordinarily possessed by a Coverholder in the rendering of their services," Compl. at ¶ 23, and that "Walnut negligently breached this duty ...." Id. at ¶ 24.  Preceding this statement, however, the allegations suggest that the duty arises specifically from the parties' Agreement.  In context, the allegation reads: "As a Coverholder pursuant to [the Agreement], Walnut owed a duty to exercise the

skill, prudence and diligence ordinarily possessed by a Coverholder in the rendering of their services."

Id. at ¶ 23.

Taken together, these allegations invoke both contract and negligence concepts.  That the "duty" is rooted in the agreement smacks of contract law, but that Walnut should have exercised the skill "ordinarily" possessed by a Coverholder evokes negligence.  Proof of the former would consist of interpretation of the Agreement and its application to Walnut's conduct, and not require an AOM as previously found by this Court with respect to the breach of contract claim.  Proof of the latter, *i.e.*, the skill, prudence, and intelligence "ordinarily" possessed by a Coverholder, seems to require proof of a Coverholder's standard of care.

1.    Summary of the Law

My research has not revealed precedential New Jersey cases that clearly resolve the applicability of the AOM statute to the allegations presented here.  Aden v. Fortish, 169 N.J. 64 (2001) clarified that malpractice actions may be brought against insurance brokers for negligently procuring insurance on behalf of an insured.  Id. at 79.  See also President v. Jenkins, 180 N.J. 550, 568-69 (2004).  But Aden did not address the applicability of the AOM statute to such claims.  See Boerger, 2005 WL 2901903 at *3 (explaining Aden's holding).  Nor did Aden speak to whether a claim by an insurance company (as opposed to an insured) against an insurance agent sounds in malpractice or ordinary negligence.

Two unpublished New Jersey appellate court decisions, however, address insurance malpractice claims in the affidavit of merit context.[2]  In Greenblatt v. Kissel, 2005 WL 3747582, *2-3 (N.J. App. Div. Feb. 9, 2006), an unpublished appellate court decision, two insureds (husband and wife) sued their

---

[2]    Some cases refer to these sorts of suits as alleging "malpractice" claims, while others describe them as alleging "professional negligence" claims.  Indeed, the text of the statute states that it applies to claims "resulting from an alleged act of *malpractice or negligence by a licensed person in his profession or occupation* ...."  N.J.S.A. 2A:53A-27 (emphasis added).  For sake of clarity, I will refer to the terms "malpractice," "professional negligence," and "negligence" interchangeably in this opinion.  I will use the term "ordinary negligence" to refer to claims that do not require proof of a deviation from professional standards.

insurer for indemnification arising out of a third-party personal injury claim on their property.  The wife operated a jewelry store out of a commercial property she owned.  Id. at *2.  She retained the defendant to procure insurance for the property and the store.  The defendant procured an insurance policy from Zurich to cover both.  Upon closing the jewelry store, the wife instructed the defendant to cancel the policy for the store but to maintain insurance on the property itself.  Defendant complied.

Several months later, Zurich purportedly mailed out a notice of late payment and pending cancellation to the property address rather than to the plaintiffs' home address.  Over the ensuing months, additional notices were sent to the property address.  Meanwhile, the wife received updated endorsements and even a refund on account of a change in premium.  Shortly thereafter, she received a copy of the late payment notice and promptly paid the balance due.  Id. at *3.  In the ensuing weeks, the wife received a demand letter from an attorney stating that his client suffered personal injuries on her property.  The alleged accident took place during the time period that the policy amount was past due, but before she received actual notice of the past due balance and paid it.

A complaint was subsequently served upon the wife by the injured party.  Upon service of the complaint, the wife notified the defendant insurance producer.  He instructed her not to answer the complaint or "risk . . . losing coverage."  Id.  Default judgment was ultimately entered against her, and she brought suit against the defendant insurance producer and Zurich for a declaration of coverage and indemnification.

The trial court granted the defendants' motion to dismiss based on upon the plaintiffs-insureds' failure to file an AOM.  Rejecting the trial court's conclusion, the appellate court reasoned:

> As we view the facts, the issues underlying defendants' alleged negligence in the procurement and placement of insurance coverage and the transmittal of notices regarding such coverage to obviously wrong addresses are matters that jurors, using ordinary understanding and experience, can determine without the benefit of the specialized knowledge of experts.

Id.  Thus, the court concluded, "[u]nder such circumstances, plaintiffs' failure to provide an affidavit

of merit did not warrant or justify the dismissal of their complaint and we reverse as a matter of law."

 Id.

Conversely, in Burns v. Chubb Ins. Companies, 2007 WL 1484480 (N.J. App. Div. May 23, 2007), another unpublished decision, the appellate division summarily concluded that an affidavit of merit was required for a malpractice claim against an insurance broker.  The plaintiff in that case sued the broker of the insurance policies, Marsh USA, Inc. ("Marsh"), claiming generally that the company engaged in malpractice, "which inhibited her ability to pursue the insurance claims against [the insurance company,] Vigilant."  Id. at *1.  The plaintiff argued before the district court, *inter alia*, that no affidavit of merit was required because Marsh was a company and therefore not a licensed "person" under the AOM statute.  In affirming the district court's rejection of that argument, the court reasoned:

> Marsh, acting as a broker, negotiated the sale of insurance provided by Vigilant. The affidavit of merit statute pertains to a variety of professionals including 'insurance producer[s].' An insurance producer is defined as any 'person required to be licensed under the laws of this State to sell, solicit or negotiate insurance,' and 'person' includes 'an individual or a business entity.' The term 'licensed persons' [in N.J.S.A. 2A:53A-26] does not mean individuals in the literal sense but may include businesses and firms offering professional services. Therefore, the company is a licensed person as contemplated by N.J.S.A. 2A:53A.

Id. at *5 (internal citations omitted).

Neither Greenblatt nor Burns addresses the factual scenario at bar.  Both of these cases dealt with malpractice claims brought by insureds against insurance brokers.  Disposition of such cases take into account New Jersey's treatment of insurance brokers as fiduciaries for their lay clients and "the increasing complexity of the insurance industry and the specialized knowledge required to understand all of its intricacies."  Aden, 169 N.J. at 78.  There is no indication in the case law that this New Jersey policy extends to commercial insurance companies, like Lloyd's, who contractually engage their own

brokers.[3]  Moreover, the relatively straightforward facts in the <u>Greenblatt</u> and <u>Burns</u> decisions did not require those courts to look to the plaintiff's underlying allegations to determine whether an affidavit was required.

In terms of federal decisional law applying New Jersey's Affidavit of Merit statute, one Third Circuit case provides guidance regarding the necessity of an affidavit of merit where an insured asserts negligence.  In <u>Cananwill, Inc. v. Fuji Express, Inc.</u>, 317 Fed.Appx. 115 (3d Cir. 2008), a commercial insured was advised by an insurance producer to finance its insurance premium through a premium finance agency.  When the insured later cancelled the insurance policy, under the terms of the finance agreement, the insured was required to forfeit $200,000 in unearned premiums to the finance agency.

Seeking indemnification from the insurance producer, *inter alia*, the insured made the following allegations:

> [the insurance producer] (1) wrongfully advised [the insured] to obtain financing . . . and breached its fiduciary duty; (2) failed to explain "all facts and terms and conditions and benefits and burdens of entering into [an agreement with] a premium finance company, nor [sic] aspects of the policy terms and conditions;" (3) "acted in its self-interest ... and failed to advise [the insured] that it would be earning" money from the financing agreement; and (4) breached its "fiduciary and contractual duties ... with respect to other aspects of the insurance provided ...."

<u>Id.</u> at 117.  The Third Circuit reasoned that the insured's "claims against [the insurance producer] are

---

[3]     In <u>Aden</u>, the New Jersey Supreme Court described professional negligence in the insurance broker-lay client context:

> [A]n insurance broker who agrees to procure a specific insurance policy for another but fails to do so may be liable for damages resulting from such negligence.  Liability resulting from the negligent procurement of insurance is premised on the theory that a broker 'ordinarily invites [clients] to rely upon his expertise in procuring insurance that best suits their requirements.'  The concept is essentially one of professional malpractice.

169 N.J. at 79 (internal citations omitted).

dependent on the standard of care in the industry, a standard not easily discernable by a lay person," id. at 118, and, thus, concluded that "[e]xpert testimony is required to determine whether such behavior fell below the industry standard of care, exactly the type of situation in which the statute and New Jersey case law require an affidavit of merit."  Id.

However, District of New Jersey cases applying the AOM statute in insurance malpractice suits reach divergent results.  In Merchants Ins. Co. of New Hampshire v. 3 R Painting & Contracting Co. Inc., 2007 WL 1037342 (D.N.J. Mar. 29, 2007) (Thompson, J.), a case most factually similar to the one presented here, an insurance agency entered into an Agency Agreement with an insurance company under which the former was to act as the non-exclusive agent in the solicitation and sale of the latter's insurance policies.  Pursuant to the parties' agreement, the agency did not have authority to declare or incur any liability on behalf of the insurance company other than as authorized by their agreement.  To that end, the agent was "required to submit all necessary information to [the company] with respect to insurance applications that [the agent] procured."  Id. at *1.  Several claims were filed against the company, which policies that company ultimately found to have been "procured through a series of misrepresentations, concealments, and/or non-disclosures" by the agent.  Id.  The insurance company brought suit against the agency, seeking reformation or rescission of the policies issued by the agent or, in the alternative, indemnification for claims to be paid.

Concluding that an affidavit of merit was not required, the District Judge reasoned that

> [the insurance company's] entitlement under the Agreement to indemnification from [the agent] does not depend on proof of deviation from a professional standard, but on whether [the agent] violated the law, the terms of the Agreement, and/or the rules and regulations set forth in [the insurance company's] underwriting manuals.

Id. at *3.  The court cited Nagim v. N.J. Transit, 848 A.2d 61, 71 (N.J. Super. Ct. 2003), in support of its conclusion—a case described as "granting third-party defendant's motion to dismiss defendant/third-party plaintiff's contractual indemnification claim where defendant/third-party plaintiff

did not submit an Affidavit of Merit, but where the claim required a showing that third-party defendant's liability arose out of its alleged failure to exercise care customary in the engineering profession." Merchants, 2007 WL 1037342 at *3, n.2. As further noted in the opinion, the insurance company argued that the common knowledge exception applied. The company, specifically, averred that it could demonstrate the agent's liability "without the use of any expert, suggesting that [its] theories turn on ordinary misrepresentations and not deviations from accepted practices of any profession." Id. The court referenced this concession as another basis for its holding. Id.

Additionally, in Boerger, the court held that an affidavit of merit was not required where an insured alleged that his broker negligently procured the wrong amount of coverage. In that case, the insured instructed the broker to obtain a minimum of $700,000 worth of coverage on several commercial properties. 2005 WL 2901903 at *1. The broker presented a binder to the insured indicating that over $900,000 had been obtained. At a later date, one of the insured's buildings caught fire and he submitted a claim to the insurance company. Id. Upon contacting the insurance company, the insured was told that the actual coverage for the building was only $450,650. The insured then brought suit against the broker, alleging negligent procurement of insurance and breach of contract.

The District Judge concluded that these allegations did not require proof of a deviation from a professional standard of care. Id. at *4. Distinguishing the New Jersey Supreme Court's decision in Aden, the court reasoned that the insurance brokers in Boerger "were not asked to use their care, skill or knowledge to assist [the insured in] choosing a certain insurance policy. Rather, the [brokers] were asked to obtain a certain dollar amount of coverage and confirmed that dollar amount in various writings to [the insured]." Id. at *3. Therefore, the court concluded, such allegations could be proven under the common knowledge exception to the AOM statute because they "do not involve any special care, skill or knowledge that is reserved to a licensed professional." Id.

A different result was reached in Carolina Cas. Ins. Co. v. Cryan's Ale House & Grill, 2009 WL

497558, *5 (D.N.J. Feb 26, 2009) (Cooper, J.), where an insurance company brought suit against its insured for indemnification.  The insured, in that case, applied for insurance with the company through an insurance broker who prepared a proposal on the insured's behalf.  At the time of the application, the insured had been threatened with an employment discrimination suit by one of its former employees.  The broker was aware of this threatened litigation, but did not reference the litigation in the proposal.  After the policy was issued, the insured was sued by the former employee and the insured sought coverage from the company.  The company contributed to settlement of the litigation, and then sued the insured for contribution.  Id. at *2.  The insured then filed a third-party complaint against the broker, alleging negligence, professional negligence, and breach of fiduciary  duty claims.  Id.

The district court, in ruling that an affidavit of merit was required, reasoned that "all three claims require proof that third-party defendants deviated from the professional standard of care in preparing the [application] on behalf of [the insured]" and that "regardless of how defendants framed their claims, because all three claims require proof of deviation from a professional standard of care, an affidavit of merit is mandatory unless an exception applies."  Id. at *5.  The court went on to hold that the common knowledge exception did not apply, reasoning that

> preparation of a proposal form for employment practices liability insurance and the determinations made in such preparation are beyond the common knowledge of lay persons.  Errors in judgment made in preparing such a proposal form differ from situations where the defendant's negligence is obvious, such as a doctor pulling out the wrong tooth, a doctor misreading a laboratory report, or a pharmacist filling a prescription with the wrong medication. Here, jurors, using ordinary understanding and experience, would not be able to determine third-party defendants' negligence without the benefit of expert testimony.

Id. at *6.

Lastly, in New Hampshire Ins. Co. v. Diller, 678 F.Supp.2d 288 (D.N.J. 2009) (Hillman, J.), the district court was presented with facts similar to those in Carolina.  The allegations in Diller revolved around an insurance broker's failure to exercise due care in completing the defendant's/third-party-

plaintiff's (insured's) insurance application.  Id. at 308 n.25.  The insured argued that its claim was for contribution, thereby attempting to fall within that line of cases not requiring an AOM for claims based on a right of contribution.  Those cases hold that a defendant's third-party claim that is "derivative of the plaintiff's professional negligence claims against the defendant . . . constitute[s] a true claim for contribution and for allocation of fault as among joint tortfeasors rather than [sic] independent claim of professional negligence."  Id. at 308-09 (internal quotation marks omitted); Diocese of Metuchen v. Prisco & Edwards, AIA, 864 A.2d 1168, 1172 (N.J. App. Div. 2005).  The court in Diller rejected the defendant's characterization of its claim, finding instead that the defendant was not merely seeking indemnification but was asserting affirmative claims.  Id. at 310.

    In addition, the court in Diller, in rejecting the insured's argument that its third-party claim fell under the common knowledge exception, followed Carolina's holding that "the alleged misinterpretation of an insurance application and its terms . . . are [not] entirely discernible by the ordinary understanding and experience of jurors."  Id. at 311.  That the insured did "not intend to provide evidence that [the broker] deviated from the standard of care customary for insurance brokers" was of no moment, the court concluded.  Id.  In the court's view, "[a]pplicability of the common knowledge exception . . . is determined [solely] based on the allegations in the complaint."  Id. (quoting Carolina,  2009 WL 497558 at *6).

    As illustrated by the foregoing synopsis of the law, there is no New Jersey case law decidedly addressing the AOM statute's requirements in the context of an insurance company alleging that its agent negligently wrote and bound insurance.  The only federal decision to address such a scenario is Merchants.  The remaining cases were each brought by insureds for some variation of negligent procurement of insurance policies.  And the federal decisions, in particular, reach different results in those contexts.  In addition, analysis in certain of the cases, including Merchants, suggest that suits brought for contractual indemnification may avoid application of the AOM requirement.  Altogether,

while these cases provide some guidance, there is no controlling precedent from the New Jersey state or federal courts to direct the result here.

2.   <u>Application</u>

Based on my reading of Lloyd's negligence allegations, I conclude that an affidavit of merit is required.  Lloyd's Complaint alleges that "[a]s a Coverholder pursuant to 2004 Binding Authority Agreement, Walnut owed a duty to exercise the skill, prudence and diligence ordinarily possessed by a Coverholder in the rendering of [its] services."  Lloyd's argues that this sort of allegation can be proven without resort to professional standards of care because the 2004 Binding Authority Agreement serves as the source of standards.  Lloyd's, further, argues that the common knowledge exception applies, citing <u>Estate of Chin v. St. Barnabas Med. Ctr.</u>, 160 N.J. 454 (1999).  In its view, a jury may simply look to the terms of the parties' agreement and Walnut's contravening actions to discern its negligence.  The essence of Lloyd's argument is that it alleges that Walnut breached an ordinary, as opposed to professional, negligence standard.

It is a close call whether Lloyd's allegations require proof of a deviation from professional standards.  On the one hand, I appreciate Lloyd's argument that it could prove its negligence claim without relying on professional standards.  It could point to the contract language to establish the duty, demonstrate that Walnut failed to abide by the language, and prove that any reasonable commercial entity would have known that writing insurance for a bar or tavern, for example, violates the contract language as the language would be understood according to industry standards.  Indeed, that a plaintiff's claim "might *implicate* a deviation from prevailing professional standards of practice" may not mean that "proof of that deviation is . . . essential to the establishment of plaintiff's [claim]."  <u>Couri</u>, 173 N.J. at 342 (emphasis added).

On the other hand, the express language of Lloyd's negligence allegations references the "accepted professional standards in the placing and writing of insurance."  Compl. at ¶ 22 (alleging that

Walnut "held itself out to Lloyd's Syndicate 1245 as" this sort of "competent Coverholder"). This language, even viewed in the light most favorable to Lloyd's, affirms that its negligence claim relies upon proof of professional standards unique to Coverholders. Lloyd's related allegation that "Walnut owed a duty to exercise the skill, prudence, and diligence ordinarily possessed by a Coverholder in the rendering of their services" is another example of this sort of affirmation. Id. at ¶ 23. Even more telling is Lloyd's allegation that "Walnut negligently breached this duty," which refers to the "duty to exercise the skill, prudence, and diligence ordinarily possessed by a Coverholder." See id. at ¶ 24. Since New Jersey case law makes clear that the language of the complaint controls in affidavit of merit determinations, I am required to accord Lloyd's negligence allegations great effect in my analysis. See Carolina, 2009 WL 497558 at *6; Palanque v. Lambert-Woolley, 168 N.J. 398, 406 (2001) ("In a common knowledge case, whether a plaintiff's claim meets the threshold of merit can be determined on the face of the complaint.").

Certainly, the 2004 Binding Authority Agreement defines the nature of the parties' relationship and establishes bounds within which Walnut was to operate, but the Agreement does not specify the manner by which Walnut was to implement each of the Agreement's terms. For example, the Agreement expressly forbids Walnut from binding and writing coverage to nightclubs. To prove its negligence claim, Lloyd's would be required to demonstrate that Walnut failed to properly investigate the business nature of applicants to properly determine whether or not such establishments were, in fact, nightclubs. The same is true with respect to Lloyd's allegations that Walnut wrote and bound policies to certain hospitality businesses without an Assault and Battery waiver. The Agreement speaks only to the percentage of liquor receipts (i.e., 33.3%) that a hospitality business may collect without being required to agree to an Assault and Battery exclusion. It does not address how Walnut was to determine whether an applicant's receipts exceeded 33.3%, e.g., by independent review of the applicant's

books or some other mode of investigation.[4]   The Court appreciates Lloyd's argument that many applications on their face expressly indicated greater than 33.33% liquor receipts.[5]   However, Lloyd's has not indicated that it intends to rely solely on Walnut's review of those applications to prove its negligence claim.   Moreover, at oral argument, Lloyd's was unwilling to concede that it would not present any expert testimony at trial to prove its negligence claim.

This is not a case involving slip and fall allegations against an insurance agent.   Such a claim would not depend upon reference to professional standards for an insurance agent; the duty to maintain one's premises is not unique to the agent's profession.   As explained by the New Jersey Supreme Court, in Couri, there is a distinction between "tort claims brought against licensed professionals that allege ordinary negligence, but not malpractice," 173 N.J. at 340-41, in that

> claims against licensed professionals acting in a professional capacity that require proof of ordinary negligence but not of a deviation from professional standards are not encompassed by the statute.   For example, while the former standard would include allegations that a psychiatrist failed to diagnose a patient properly or provide proper treatment, it would exclude allegations that a psychiatrist negligently tripped a patient when the patient entered the doctor's office, which clearly would be outside the scope of the statute.

Id.   Here, Lloyd's allegations center upon Walnut's negligent performance of its duties as a Coverholder in writing and binding policies.   As only licensed insurance professionals may write and bind policies, there exists no ordinary layman negligence standard by which Walnut's conduct could be adjudged.   It is only by reference to professional standards that Lloyd's can prove its negligence claim.

This view is supported by the Third Circuit's analysis in Cananwill.   As noted, that case involved

---

[4]     The Complaint asserts that the Agreement "required inspections of the insureds' business premises and operations followed by an inspection report issued in a timely manner after coverage was bound." Compl. at ¶ 19.  The Complaint does not speak to how the percentage of liquor receipts is to be calculated.

[5]     See Compl. at ¶ 20 ("In most instances the inspection report which was generated either confirmed the percentage of liquor sales stated in the application, or indicated a higher percentage of liquor sales than was stated on the application ....") (emphasis added).

a commercial insured who was advised by an insurance producer to finance its insurance premium through a premium finance agency.  The Third Circuit reasoned that the insured's allegations—that the broker "breached its contractual duties . . . with respect to . . . aspects of the insurance provided"—required proof of a deviation from a standard of care.  317 Fed.Appx at 118.   Likewise, here, Lloyd's allegation that Walnut breached its "duty to exercise the skill, prudence, and diligence ordinarily possessed by a Coverholder" must be proven by reference to professional standards.  Accord N.J.S.A. 2A:53A-27 (stating that the statute applies to claims "resulting from an alleged act of malpractice or negligence by a licensed person *in his profession or occupation* ....") (emphasis added).

Estate of Chin v. St. Barnabas Medical Center does not compel a contrary result.  In that case, the New Jersey Supreme Court ruled that expert testimony was not needed to establish a medical malpractice claim involving a patient who died from an incorrectly performed surgical procedure.  160 N.J. at 471.  The court neatly summarized the basis for its ruling as follows:

> [The patient's] injury was caused by an incorrect hook-up of the hysteroscope, which introduced gas into her uterus and bloodstream. *All the parties agreed that [her] death was caused by an erroneous hook-up of the apparatus.* Expert testimony was not required to establish that only a lack of reasonable care or negligence by one or more of the defendants could cause this medical accident. *No party contested the fact that the misconnection was the result of negligence on the part of at least one defendant.* Each defendant simply insisted that he or she was not the party individually responsible.

Id. (emphasis added).  That the negligent act was undisputed in Estate of Chin clearly distinguishes it from the facts here and renders it wholly inapplicable.

Furthermore, I find the decision in Merchants distinguishable from the case at hand.  For one, Plaintiff has not conceded a willingness to forego the presentation of expert testimony in support of its negligence claim, as did the plaintiff in that case.[6]  Second, Lloyd's Complaint does not cite to an

---

[6]     Even if Plaintiff had so conceded, I question whether judicial reliance on such a representation is advisable in light of New Jersey's concentrated focus on the language of the complaint in ascertaining whether an AOM is required.  See e.g., Palanque, 168 N.J. at 406.

indemnification clause in the 2004 Binding Authority Agreement.  The court in <u>Merchants</u> relied, in part, on New Jersey cases that make an exception for contractual indemnification claims.  As there is no allegation to that effect here, the indemnification exemption cannot apply.

Lastly, and most importantly, Lloyd's complaint specifically references the "the skill, prudence, and diligence ordinarily possessed by a Coverholder in the rendering of their services."  No similar language is mentioned in the <u>Merchants</u> ruling.  Thus, I conclude that Lloyd's must rely on proof of a deviation from a professional standard of care to prove its negligence claim and an affidavit of merit is therefore required.  <u>Accord</u> <u>Nuveen Mun. Trust v. Withumsmith & Brown, P.C.</u>, 2009 WL 3246139, *3 (D.N.J. Oct. 7, 2009) (relying on complaint's "repeated references to the professional standards" applicable to the defendants-accountants in holding that affidavit of merit was required for the plaintiff's fraud claim).

For similar reasons, I reject Plaintiff's argument that the common knowledge doctrine applies.  A reasonable juror could not discern the reasonableness of Walnut's investigative procedures without the assistance of expert testimony.  Having decided that an affidavit is required, I must now consider whether Lloyd's late filing may be excused.

B.     <u>Equitable Considerations Justifying Late Filing</u>

In a recent decision, <u>Shamrock Lacross, Inc. v. Klehr, Harrison, Harvey, Branzburg & Ellers, LLP</u>, — A.2d —, 2010 WL 2346341 (N. J. App. Div. Jun. 14, 2010), the Appellate Division excused the late filing of an affidavit of merit on equitable grounds. The plaintiff in that case alleged negligent omissions by a patent attorney who was not actively licensed to practice in New Jersey at the time of the omissions.  The equitable basis cited by the court was that "the case law in [New Jersey] was unsettled to date as to whether an affidavit of merit is required in such circumstances, and the federal decisions on the subject attempting to apply New Jersey law have taken arguably divergent approaches." <u>Id.</u> at *1.

In excusing the late filing in that case, the Appellate Division reasoned that the plaintiff's interpretation of the statute was not "frivolous or insubstantial" in light of the lack of clear controlling precedent. Id. at *15. Specifically, the court noted, the interests of justice required that the plaintiff be permitted to proceed "[g]iven the sparse and murky nature of prior decisional law, and the arguable ambiguity of the statute ...." Id. at *16. That the plaintiff belatedly served an AOM, that was not challenged substantively by the defendants, also factored into the court's analysis. Id. at *15.

Similar to the legal landscape in Shamrock, there is no definitive New Jersey case law applicable here and the federal decisions are scant or inapplicable. The most directly applicable federal decision is Merchants, in which the court held that an AOM was not required because the parties' agreement served as the basis for the plaintiff's causes of action. Although for the reasons explained *supra*, I find Merchants distinguishable, nonetheless Lloyd's could have found that decision supportive of its position that no AOM was required. Furthermore, as there were no other cases in the New Jersey state or federal judicial landscape to assist Plaintiff in determining whether an affidavit was required, I find the lack of clear jurisprudential authority justification for excusing the late filing here. That Lloyd's belatedly served an affidavit, and Walnut has not challenged the substance of that affidavit, further brings this case in line with Shamrock. Accordingly, based upon these compelling equitable considerations, I deny Walnut's motion to dismiss on this basis.

C.    Substantial Compliance

Even assuming that the aforesaid equitable grounds were insufficient to excuse Lloyd's late filing, there are grounds for concluding that Lloyd's substantially complied with the AOM statute. The doctrine of substantial compliance requires that the defaulting party show:

> (1) the lack of prejudice to the defending party; (2) a series of steps taken to comply with the statute involved; (3) a general compliance with the purpose of the statute; (4) a reasonable notice of petitioner's claim, and (5) a reasonable explanation why there was not a strict compliance with the statute.

Alan J. Cornblatt, P.A. v. Barow, 153 N.J. 218, 239 (1998) (quoting Bernstein v. Board of Trustees of Teachers' Pension & Annuity Fund, 151 N.J.Super. 71, 76-77 (App. Div. 1977)). See also Mayfield v. Comm'y Med. Assoc., 335 N.J.Super. 198, 203 (App. Div. 2000).

Although New Jersey courts take seriously the plaintiff's obligation to produce an AOM they "do not slavishly limit themselves to the dry words of legislation nor rely on mere abstract logic to determine what interpretation of a statute would fulfill the Legislature's purpose." Mayfield, 335 N.J.Super. at 205. Recognizing that "[m]ore is called for than a merely mechanical analysis," courts "go beyond the literal language in order to implement the legislative intent and its policy mandate." Id. The purpose of the AOM statute is to "require plaintiffs in malpractice cases to make a threshold showing that their claim is meritorious." Id. at 204 (quoting In re Petition of Hall, 147 N.J. at 391). Thus, courts must engage in a "fact-sensitive analysis involving the assessment of all of the idiosyncratic details of a case to determine whether reasonable effectuation of the statute's purpose has occurred." Galik, supra at 356 (discussing Cornblatt, 153 N.J. at 240) (internal quotation marks omitted).

So, for example, in Mayfield, the Appellate Division held that the combination of a late-served affidavit of merit and a timely-provided expert report satisfied the statute. Id. at 207. In that medical malpractice action, the plaintiffs obtained an AOM during the statutory period but failed to serve it upon the defendant until after the motion to dismiss was filed. During the course of the proceedings, however, the plaintiffs provided defendant with an unsworn and uncertified expert report signed by the same doctor who executed the AOM. Id. at 201.

Turning to the five-point substantial compliance test, the Appellate Division reasoned the balanced tipped in the plaintiff's favor. First, the court reasoned, the defendants suffered no prejudice such as a loss of evidence or undue additional defense costs. Id. at 207 ("[W]e see no prejudice whatever that would result to defendants, other than that they would have to defend against a potentially meritorious claim, which is not legal prejudice.") Second, the plaintiffs took "a series of steps . . . to

assist them to meet the requirement that 'plaintiffs in malpractice cases . . . make a threshold showing that their claim is meritorious." Id. (quoting In re Petition of Hall, 147 N.J. at 391).  The plaintiff timely obtained the AOM and filed it with the court, and the AOM complied with the statutory requirements. Id. at 208.  In addition, the expert report was a formal document on the doctor-expert's letterhead. Although it was terse, and unsworn, the report included the content demanded by the statute.  Id.  The plaintiffs failed only in forwarding the AOM to the defendants.  The content of the AOM and expert report also satisfied the third and fourth points of the test—general compliance with the purpose of the statute, and providing reasonable notice of the plaintiffs' claim.  Lastly, plaintiffs' counsel's diligence in all other regards in his handling of the case was "deemed a sufficiently reasonable explanation as to enable him and his client to avoid litigation disaster for a wholly inadvertent and non-prejudicial mistake."  Id.  Mayfield was described by the Supreme Court in Galik as "correctly interpreting" and applying substantial compliance jurisprudence.  Id. at 356.

Similarly, in Galik, the New Jersey Supreme Court held that a plaintiff who  served two detailed expert reports on the defendants substantially complied with the statute.  Id. at 356-68.  In that medical malpractice suit, the plaintiffs provided defendants with two expert reports during the course of pre-trial settlement negotiations.  The expert reports (an initial and supplemental report) were prepared by a board-certified physician and stated that defendants substantially deviated from the standard of care in treating the plaintiff.  Id. at 347-48.  The reports were unsworn and uncertified.  Id. at 349.  Subsequent to the motion to dismiss being filed, the plaintiff also supplied an AOM but did not argue before the Court that the expert reports alone were sufficient to satisfy the statute.

Applying the five-point test, the Court concluded, first, that there was no prejudice to the defendants.  "Indeed, one might fairly argue that it was the plaintiff who was prejudiced where, as here, defendants relied on [the expert] reports to engage in settlement efforts . . . then, without warning, moved to dismiss ...."  Id. at 356-57.  That plaintiffs retained the expert and forwarded the reports to

the defendants "constituted a good faith effort" to comply with the statute and to satisfy the statute's purpose, thereby meeting the second and third elements of the substantial compliance test.  Id. at 357. The defendants, obviously, received notice (the fourth element) and that the plaintiffs' attorney believed he was doing more than required by the statute was a reasonable justification for his failure.  Id.

Suggesting that future reliance by counsel on expert reports alone to satisfy the AOM statute will not be so favorably looked upon by the court, it noted that establishing the five elements of substantial compliance "is a heavy burden."  Id.  The plaintiffs met that burden, in that case,  because their counsel provided defendants with "a detailed expert's report verifying the legitimacy of the claim long before filing the complaint ...."  Id.  However, the Court noted, it was "because [counsel's] actions were taken in previously uncharted waters, that [counsel's reliance] was reasonable."  Id. at 358.

Finally, the Galik Court considered whether the expert reports substantively satisfied the AOM statute.  The report did not specifically name the defendants but stated that the physicians who treated the plaintiff deviated from the standard of care.  The Court considered this information adequate, especially in light of the late-filed AOM which specifically named the defendants.  Id.  Though that late-filed AOM was untimely, it could "be resorted to as post-hoc evidence of what [the initial expert report] was meant to establish ...."  Id.

Here, Lloyd's served Walnut with an AOM in the consolidated case, Liberty Syndicates, prior to Walnut's filing of the instant motion to dismiss.[7]  In addition, salient portions of the PFC Audit were provided to Walnut during pre-suit negotiations.  (Like the expert report in Mayfield, the PFC Audit was an unsworn document on a professional's letterhead.)  Lloyd's, further, offered to engage in a *quid pro quo* exchange of information whereby Lloyd's would disclose the entire audit.  And, after the Rule 26 conference was held by the Magistrate Judge in this case, Lloyd's made the audit available for inspection.

---

[7]     The parties agreed to consolidate the cases, for discovery purposes, in a telephone conference with the Magistrate Judge before the AOM was due in the instant case, although the consolidation order was not entered until after the AOM's October 1st due date.

Walnut, however, chose not to accept either offer to view the audit in its entirety.  For the reasons explained in more detail below, I conclude that Plaintiff's affidavit in the consolidated case, along with service of salient portions of the PFC Audit, satisfy the five elements of the substantial compliance test.

*Lack of prejudice to the defending party*

As an initial matter, I find it disingenuous for Walnut to argue prejudice when it treated Lloyd's complaint as if rooted in the 2004 Binding Authority Agreement throughout the settlement negotiations, and made no mention of an affidavit of merit requirement before the Magistrate Judge in conferences. While Walnut is not responsible for pointing out to Lloyd's its obligations under the statute, Walnut noticeably neglected to mention, at the status conference setting dates for dispositive motions to be filed, its intention to file the instant motion.

In addition, that Walnut received a timely AOM in the related Liberty Syndicates action is significant.  By agreeing to consolidate the Liberty Syndicates action for discovery purposes, Walnut essentially conceded that the cases are factually and legally similar.  While the consolidation was not of the entire case, that Walnut agreed to consolidation for discovery purposes nonetheless makes clear that it deemed the cases sufficiently similar.  Indeed, both cases involve the same defendants, the same defense counsel, and practically indistinguishable allegations.  In this connection, that an expert executed an affidavit in the consolidated case strongly suggests that the instant action is not frivolous either. Moreover, the AOM filed in this case was served only eighteen days after expiration of the statutory period.  So, the only disadvantage that Walnut would suffer here is to defend against a meritorious case, and that does not constitute legal prejudice.  See Mayfield, 335 N.J.Super.  at 207.

*Series of steps taken to comply with the statute*

Just as the forwarding to the defendant of an expert report by the plaintiffs in Mayfield and Galik satisfied this element, so too does Lloyd's forwarding salient portions of the PFC Audit to Walnut demonstrate that Lloyd's engaged in a series of steps to comply with the statute.  The only difference

between the PFC Audit and the expert reports in <u>Mayfield</u> and <u>Galik</u> is that the reports included language reflective of that required in an AOM, *e.g.*, that the defendant deviated from the standard of care. The audit here was more directed at the breach of contract claim, but does contain language suggesting that Walnut did not live up to the professional standards expected of Coverholders. So, while the audit alone may not substantively satisfy the AOM requirement, it is nonetheless proof that Lloyd's took a series of steps to comply with the statute particularly when taken together with the AOM provided in the Liberty Syndicates action.

*General compliance with the purpose of the statute*

The purpose of the AOM statute is to weed out frivolous claims. Clearly, the suit is not frivolous. An AOM was obtained for the virtually indistinguishable Liberty Syndicates action, which alone strongly suggests that the instant action is not frivolous. More importantly, that the AOM was filed in this case, *albeit* shortly after the statutory deadline expired, establishes the non-frivolous nature of this action. Moreover, the PFC Audit further demonstrates that there is a legitimate basis for Lloyd's claims.

*Reasonable notice of petitioner's claim*

The AOM in the Liberty Syndicates suit, along with salient portions of the audit and the pre-suit negotiations correspondence, provided reasonable notice of Lloyd's negligence claim. The correspondence between counsel during settlement negotiations, in particular, involved very specific allegations and reference to contract language in the 2004 Binding Authority Agreement. These documents provided pre-suit notice to Walnut of the nature and extent of Lloyd's claims.

*Reasonable explanation why there was not a strict compliance with the statute*

Lloyd's counsel explains that it did not believe an AOM was required in this case because, in his view, the claims could be proven by relying solely on the language of the Agreement to prove its case. The problem with this argument is that it presumes no affidavit was required in this case while Lloyd's

provided an affidavit in the consolidated case.  The Court notes, however, that there are two different counsel involved; thus, that the counsel in the Liberty Syndicates action believed an affidavit was required cannot be imputed to Lloyd's counsel in this case.  In addition, as Lloyd's counsel here points out, the complaint in Liberty Syndicates expressly identifies its cause of action as one sounding in "Professional Malpractice" whereas the complaint here captioned its cause of action as "Negligence." More importantly, as explained *supra*, that the case law does not provide clear guidance to counsel here supports counsel's argument that he possessed a reasonable basis for concluding that no affidavit was necessary.  Accordingly, I find that Lloyd's counsel has demonstrated a reasonable basis for failing to comply strictly with the statute.  This, along with its satisfaction of the preceding four factors, leads me to conclude that Lloyd's substantially complied with the Affidavit of Merit statute.[8]

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, Defendant's motion to dismiss for failure to timely file an affidavit of merit is DENIED with respect to Plaintiff's negligence claim.  Plaintiff's cross-motion for *nunc pro tunc* compliance with respect to the filing of an AOM on its negligence claim is GRANTED.


Dated:        June 24, 2010                              /s/ Freda L. Wolfson_____
                                                        Freda L. Wolfson, U.S.D.J.

---

[8]      Because I rule on equitable grounds, based on the recent <u>Shamrock</u> ruling, and on substantial compliance grounds, I need not reach the parties's arguments regarding the applicability of the estoppel doctrine set forth in <u>Ferriera v. Rancocas Orthopedic Assocs.</u>, 178 N.J. 144 (2003) to federal courts, as was addressed in <u>Diller</u>.  I, additionally, need not address Plaintiff's argument that its claim is for "money damages" and, therefore, does not fall under the AOM statute's ambit, though I note here the skepticism I expressed in my prior ruling regarding the viability of that argument on these facts.