<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| SYNDICATE 1245 AT LLOYD'S, ON BEHALF OF ITSELF AND OTHER CERTAIN INTERESTED UNDERWRITERS AT LLOYD'S, LONDON,<br><br>Plaintiff,<br><br>v.<br><br>WALNUT ADVISORY CORPORATION, THE CARMAN CORPORATION, and JOHN DOES 1-5,<br><br>Defendants.<br><hr>WALNUT ADVISORY CORPORATION,<br><br>Third-Party Plaintiff,<br><br>v.<br><br>THE CARMAN CORPORATION and MILLER INSURANCE SERVICES LIMITED,<br><br>Defendants. | Civil Action No.: 09-1697<br><br>**MEMORANDUM AND ORDER** |

**SHERIDAN, U.S.D.J.**

This matter comes before the Court on two motions from two separate cases, *Liberty Syndicates at Lloyd's v. Walnut Advisory Corp., et al.*, No. 09-cv-1343 (the "*Liberty* Action") and *Syndicate 1245 at Lloyd's v. Walnut Advisory Corp., et al.*, No. 09-cv-1697 (the "*Syndicate 1245* Action"). Both motions are for summary judgment. While these cases involve different plaintiffs and different causes of action, the parties and claims involved in the two motions are nearly identical. Accordingly, the Court permitted the parties to combine discovery and file a single brief on the limited issue of whether third-party defendant Miller Insurance Services Limited is entitled to

summary judgment of third-party plaintiff Walnut Advisory Corporation's impleader claims in both the *Liberty* Action and the *Syndicate 1245* Action on the basis of improper venue.

For the reasons stated below, both motions are denied.

## I. Background

A. Procedural History

The *Liberty* Action began on March 23, 2009. Liberty Syndicates at Lloyd's ("Liberty"), a United Kingdom-based insurer and Lloyd's of London syndicate,[1] commenced a diversity action in this Court against Walnut Advisory Corporation ("Walnut"), a business entity authorized to write and/or broker insurance in the State of New Jersey. Liberty alleged that Walnut was an insurance agent or "Coverholder"[2] for Liberty pursuant to two one-year Binding Authority Contracts ("BACs"). The first BAC was in effect from January 1, 2005 to January 1, 2006 (the "2005 BAC"), and the second, from January 1, 2006 to January 1, 2007 (the "2006 BAC"). Additionally, each BAC contained a forum selection clause expressly designating the Federal District Court in New Jersey as the exclusive jurisdiction for any dispute between the parties. According to Liberty, Walnut violated the terms and conditions set out in the BACs by writing risks, without Liberty's knowledge or approval, that were outside the BACs' terms and conditions, Liberty's underwriting manual,

---

[1] Lloyd's of London is not itself an insurance company, but rather, a marketplace in which members of Lloyd's of London underwrite insurance through syndicates on whose behalf professional underwriting agents accept risks. Liberty's Am. Compl. ¶ 6.

[2] A "Coverholder" is a person or entity authorized by the Corporation of Lloyd's to accept or issue insurance documents evidencing the acceptance of risks on behalf of underwriting syndicates at Lloyd's of London. Liberty's Am. Compl. ¶ 9.

and/or written directives.

The *Syndicate 1245* Action began on April 2, 2009. Lloyd's Syndicate 1245 ("Syndicate 1245"), also a United Kingdom-based insurer and Lloyd's of London syndicate, commenced a nearly identical action against Walnut. Syndicate 1245 alleged that Walnut was a Coverholder for Syndicate 1245 pursuant to a one-year Binding Authority Contract that was in effect the year before Liberty's BACs, from January 1, 2004 to January 1, 2005 (the "2005 BAC").

In response to each action, Walnut filed an answer and a third-party complaint against The Carman Corporation ("Carman") and Miller Insurance Services Limited ("Miller") seeking indemnification and/or contribution for all damages assessed against Walnut in the underlying actions. Carman is a Pennsylvania retail broker. According to Walnut, Carman was responsible for preparing and executing the insurance policies that are the subject of the underlying actions. Miller is an international insurance specialist and reinsurance broker operating within the Lloyd's of London insurance market. Miller was also the designated Lloyd's broker in all three Binding Authority Contracts (collectively, the "BACs") and acted as insurance intermediary between both Walnut and Syndicate 1245 as well as Walnut and Liberty. As insurance intermediary, Miller received and distributed all communications between the parties. According to Walnut, Miller is liable for both failing to transmit pertinent information between the parties and failing to provide services Miller was obligated to provide as the designated Lloyd's broker.

On March 26, 2010, Miller filed a motion in the *Liberty* Action to dismiss the third-party complaint pursuant to Rule 12(b)(3) of the Federal Rules of Civil Procedure for improper venue. Miller's core contention was that the business relationship between Walnut and Miller was governed solely by certain Terms of Business Agreements ("TOBAs"). According to Miller, three separate

TOBAs were in effect during the applicable time period: one from February 5, 2003 until December 2004 (the "2003-2004 TOBA"); one from December 2004 through July 31, 2006 (the "2005-July 2006 TOBA"); and one from August 1, 2006 (the "post-July 2006 TOBA"). Pursuant to the TOBAs, any dispute that arises between the parties must be submitted to either "the Courts of England" or "the High Court in London."

On October 12, 2010, the Court converted Miller's motion to dismiss the complaint of third party plaintiff into a motion for summary judgment and provided the parties with the opportunity to take discovery on issues related to venue. On October 21, 2010, after being appraised of the similarities in the *Liberty* Action and the *Syndicate 1245* Action, the Court permitted the parties to take discovery with respect to the relevant venue issues in both actions. On April 21, 2011, Miller filed motions in both the *Liberty* Action and the *Syndicate* Action for summary judgment on the basis of improper venue.[3]

B.  The Relationship Between Walnut and Miller

The main contention between the parties is whether the TOBAs govern their relationship. Miller's argument that the TOBAs govern Walnut and Miller's relationship is two-fold. First, Miller argues that it is not bound by the BACs because each BAC was an agreement between Walnut and a Lloyd's syndicate, not Miller. Supp. Br. 2. Miller never signed the BACs. *Id.* Second, Miller

---

[3]  As a technical matter, these motions may properly understood as motions to transfer venue pursuant to 28 U.S.C. § 1404(a). *See One Beacon Ins. Co. v. JNB Storage Trailer Rental Corp.*, 312 F.Supp.2d 824, 828-29 (E.D. Va. 2004) (outlining the relationship between the doctrine of ancillary venue and venue challenges from properly-impleaded third-party defendants). However, since the parties briefed the issue as a motion for summary judgment, the Court applied the Rule 56 summary judgment analysis.

argues that the TOBA's govern Walnut and Miller's relationship because Walnut received notice of the TOBAs, and, subsequent to receiving notice, Walnut performed under the terms of the TOBAs. *Id.* at 16-27.  Regarding notice of the TOBAs, Miller alleges that it provided Walnut with three types of notification: direct mailings, emails containing hyperlinks and reference to the TOBA, and instructions located on their client website/extranet. *Id.* at 6-7, 11-15.  Regarding Walnut's alleged performance, Miller claims that Walnut never questioned Miller about the TOBAs, nor did Walnut contact Miller to express its disagreement with any specific provisions contained therein. *Id.* at 7. Miller argues that these omissions reveal that Walnut continued its relationship with Miller implicitly in accordance with the provisions of the TOBAs throughout the entire time period relevant to this dispute. *Id.*

Walnut's argument that the TOBAs do not govern Walnut and Miller's relationship is also two-fold.  First, Walnut argues that, even though Miller is not a signatory to the BACs, Miller is party to the agreement. Opp'n Br. 21-30.  In support of this claim, Walnut notes that each BAC provides for Miller's brokerage fees, Miller's name appears prominently in the header of each and every page of every BAC, every BAC contains Miller's appraisal of Walnut as Coverholder, and every appraisal is specifically signed on behalf of Miller. *Id*. at 22-29.  Walnut further notes that, of the forty provisions in each BAC, roughly twenty concern Miller. *Id.* at 22.  Finally, Walnut claims that Miller is bound by the terms of the BACs based upon principles of agency because Miller acted as a dual agent for both Walnut and Liberty. *Id.* at 29-30.

Second and apart from Walnut's argument that Miller is bound by the BACs, Walnut argues that it never received, acknowledged, or agreed to any TOBA. *Id*. at 4-21.  Regarding Miller's alleged mailings, Walnut denies having received them. *Id.* at 5-6.  Additionally, Walnut claims that

5

the other notifications were insufficient to provide notice of binding contractual terms. *Id.* at 6-20. Regarding Walnut's alleged performance under the terms of the TOBAs, Walnut claims it was only acting in accordance with the BACs, not the TOBAs. *Id.* at 30.

## II. Standard of Review

Summary judgment is appropriate when the moving party demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to a material fact exists only if a reasonably jury could return a verdict for the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Such a fact is considered material only if the fact may affect the outcome of the litigation based on the substantive law. *Id.* "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255).

## III. Contract Law

When one party makes an offer to another party, acceptance of the offer by the offeree is required to form a contract. *See Weichert Co. Realtors v. Ryan*, 608 A.2d 280, 284 (N.J. 1992) (citing *Borough of W. Caldwell v. Borough of Caldwell*, 138 A.2d 402, 410 (N.J. 1958)); 2 *Williston on Contracts* § 6:1 (4th ed. 2007). Acceptance can be express, creating an express contract, or implied by conduct, creating a contract implied-in-fact. *Graziano v. Grant*, 741 A.2d 156, 162 (N.J.

Super. Ct. App. Div. 1999).

There is no question that Walnut and Miller are bound by a contract implied-in-fact. *See* Statement of Facts ¶¶ 11, 18, 26; Counter Statement of Facts ¶¶ 11, 18, 26. Additionally, it is clear from the statements of both parties that the three BACs form the backbone of this agreement: Miller had actual knowledge of the terms of each BAC. Statement of Facts ¶ 11. Miller performed under the terms of each BAC. *Id.* Miller's brokerage fees were provided for in each BAC. *See* 2004 BAC, at 38; 2005 BAC, at 41; 2006 BAC, at 43. Miller's argument that it is not bound by the terms of the BACs because it never signed the BACs is unavailing as acceptance need not be express, it can be implied by conduct. *See Graziano*, 741 A.2d at 162.

The issue here is not whether the BACs form the basis of Walnut and Miller's contract, but whether the TOBAs' forum selection clauses are part of Walnut and Miller's contract. A contract implied-in-fact will incorporate terms if the non-drafting party received adequate notice of terms and assented to them, as evidenced by objective conduct. *See, e.g.,Estate of Harold Oshinsky v. N.Y. Football Giants, Inc.*, No. 09-cv-1186 (PGS), 2011 WL 383880, at *7 (D.N.J. Feb. 2, 2011);*In re The Score Board, Inc.*, 238 B.R. 585, 591 (D.N.J. 1999); *Penthouse Int'l Ltd. v. Eastman Kodak Co.*, 430 A.2d 971, 973 (N.J. Super. Ct. Ch. Div. 1980), *aff'd* 445 A.2d 428 (N.J. Super. Ct. App. Div. 1982); *see also* 2 Williston on Contracts § 6:44 (4th ed. 2007). In New Jersey, "[t]he issue of reasonable notice regarding a forum selection clause is a question of law for the court to determine." *Caspi v. Microsoft Network, LLC*, 732 A.2d 528, 533 (N.J. Super. Ct. App. Div. 1999).

Miller alleges that it provided Walnut with three varieties of TOBA notification: direct mailings, emails containing hyperlinks and references, and client website/extranet terms and conditions. Supp. Br. 6-7, 11-15. Regarding the direct mailings, Miller alleges that it mailed each

7

of the TOBAs directly to Walnut. *Id*. 6-7. According to Miller, the 2003-2004 TOBA was mailed on or about February 5, 2003, the 2005-July 2006 TOBA was mailed on or about December 20, 2004; and the post-July 2006 TOBA was mailed on or about July 29, 2006. *Id.* Walnut denies receipt of these mailings. Opp'n Br. 4-6. If Miller produced definitive proof that Walnut received either mailing, Walnut's implied assent to the TOBAs could be inferred from Walnut's subsequent conduct. *See, e.g., The Score Board, Inc.*, 238 B.R. at 591. In the absence of such proof, Miller has failed to meet its factual burden for summary judgment. *See* Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Regarding the hyperlinks and references contained in the email footers, Miller alleges that every outgoing email sent by a Miller employee from February 5, 2004 through December 31, 2006 contained a footer noting that Miller's standard terms of business applied to all insurance related services carried out by Miller.[4] Supp. Br. 11-14. Walnut does not deny receipt of these emails, but argues that these references and hyperlinks did not provide Walnut with adequate notice. Opp'n Br. 6-11. Walnut claims that the language at the bottom of each email was boilerplate language that had no bearing on the actual message in the email. *Id.* at 7. Additionally, Walnut claims that it had no reason to click on any of the hyperlinks and, as a matter of fact, did not click on any of the hyperlinks. *Id*.

To support their claim that the references and hyperlinks provided sufficient notice to Walnut of the forum selection clause, Miller cites to cases dealing with forum selection clauses in two types

---

[4] Notably, Miller does not allege that these email footers were sent or received before January 1, 2004. Thus, any notice provided by these emails has no impact on the 2004 BAC.

of online agreements, specifically "clickwraps" and "browsewraps."[5] Supp. Br. 21-26. Generally, courts have enforced forum selection clauses in clickwrap agreements, finding that the clickwrap agreement, which collects all of the terms of the agreement in a single dialog box and then requires the user to affirmatively accept the agreement before proceeding, makes every term equally visible. *See Major v. McCallister*, 302 S.W.3d 227, 229 (Mo. Ct. App. 2009). On the other hand, courts have only enforced the forum selection clauses in browsewrap agreements when the specifics surrounding agreement revealed either that the user knew or should have known about the existence of the terms and conditions that contained the forum selection clause. *See Hoffman v. Supplements Togo Mgmt., LLC*, 18 A.3d 210, 220 (N.J. Super. Ct. App. Div. 2011) (declining to enforce a forum selection clause in a browsewrap agreement where terms and conditions were listed at the bottom of the webpage); *Sw. Airlines Co. v. BoardFirst, LLC,* No. 3:06-cv-0891-B, 2007 WL 4823761, at *4 (N.D. Tex. Sept. 12, 2007) (enforcing a forum selection clause in a browsewrap agreement where user received actual knowledge of terms and conditions from a cease-a-desist letter); *Major*, 302 S.W.3d at 230 (enforcing a forum selecting clause in a browsewrap agreement where each step of the agreement required affirmative assent on behalf of the user and each affirmative assent was coupled with a notice of terms and conditions and a hyperlink connected thereto). The central issue in both of these types of agreements is whether or not the forum selection clause is "immediately

---

[5] Clickwraps are online agreements that require a user to "consent to any terms or conditions by clicking on a dialog box on the screen in order to proceed with the internet transaction." *Feldman v. Google, Inc.*, 513 F.Supp.2d 229, 236 (E.D. Pa. 2007). Browsewraps are online agreements where the user "does not click an icon to manifest acceptance but instead is presented with prominent language on his or her screen that the 'use of the [web]site constitutes acceptance of its terms of service.'" *Hoffman v. Supplements Togo Mgmt., LLC*, 18 A.3d 210, 219 (N.J. Super. Ct. App. Div. 2011) (quoting *Major v. McCallister*, 302 S.W.3d 227, 230 (Mo. Ct. App. 2009)).

visible." *See Hoffman*, 18 A.3d at 216-20.

In the present case, the hyperlinks and references in Miller's emails most closely resemble the terms and conditions in those browsewrap agreements that courts have declined to enforce. *See id.* at 220. As stated earlier, while Walnut and Miller are not parties to an express contract, the BACs constitute the backbone of their relationship. When Walnut entered the BACs, the TOBAs were neither appended to the contract nor were they immediately visible. *See* Supp. Br. 11-14. Additionally, Walnut only added the hyperlinks and references after the 2004 BAC came into effect. *Id*. at 11-12. The Court finds that these notifications, like the terms and conditions listed on a submerged portion of a webpage in certain browsewrap agreements, were insufficient to provide adequate notice of the TOBAs.

Finally, regarding the terms and conditions on Miller's client website/extranet, Miller alleges that its client website/extranet provides an electronic facility for its clients to access information concerning their business with Miller, including documents and financial transactions. *Id.* at 15. Miller claims that its client website/extranet service is provided free of charge in return for the user's agreement to the website's terms and conditions of use (the "website terms"). *Id.* The website terms state that any services provided by Miller will be governed by "Miller's standard terms of business." *Id.* at 21. Additionally, the website terms include a jurisdiction clause designating the "Courts of England and Wales" as the jurisdiction for any disputes arising in connection with the website terms. *Id.* According to Miller, the phrase "Use of this web-site implies acceptance of our Terms of Use" appeared when a user accessed the client website, and a link at the bottom of each page of the website. *Id.* at 20. Finally, Miller has provided evidence that Walnut used the client website/extranet sixty-nine times between January 2004 and November 2005. *Id.*

While Miller's client website/extranet closely approximates the browsewrap agreement that the Missouri court of appeals enforced in *Major v. McCallister,* the instant case is distinguishable from *Major* by virtue of the 2004 BAC. *See* 302 S.W.3d 227, 229 (Mo. Ct. App. 2009).  In *Major*, the entire transaction between the website and the user occurred in single session. *Id.* at 228.  Additionally, all of the terms of the agreement were immediately visible at the moment the user agreed to the terms. *Id*. at 230.  In contrast, when Walnut first accessed the client website/extranet, the implied contract between Walnut and Miller was already in effect. *See* 2004 BAC, at 25; Statement of Facts ¶ 39.  Because the relationship between Walnut and Miller was not limited to the bounds of Miller's client website/extranet, the forum selection clause referenced in the website terms did not provide fair notice. *See Hoffman v. Supplements Togo Mgmt., LLC*, 18 A.3d 210, 216-17 (N.J. Super. Ct. App. Div. 2011).  Thus, the notice provided by Miller's website/extranet was insufficient to notify Walnut of the effect of the website's contractual terms on Walnut and Miller's existing contractual relationship.

Ultimately, the Court finds that Walnut did not receive sufficient notice of the TOBAs.  Since Walnut did not receive sufficient notice of the TOBAs, the forum selection clauses included in the TOBAs are not part of Walnut and Miller's implied contract.  As a result, Miller's twin motions for summary judgment on the basis of improper venue must fail.

### IV.  Order

This Court has reviewed all submissions and opted to rule based on papers submitted and without oral argument, pursuant to Federal Rule of Civil Procedure 78.  For the reasons set forth in the above memorandum,

IT IS on this 15TH day of November 2011,

ORDERED that third-party plaintiff Walnut Advisory Corporation's motion for summary judgment [No. 09-cv-1697, Docket Entry No. 75] is DENIED.

                                                                                          *s/Peter G. Sheridan*  
                                                                                          PETER G. SHERIDAN, U.S.D.J.

November 15, 2011